May it please the Court, my name is Brenna Bell, and I'm here on behalf of the Plaintiff Appellant's Klamath-Syskiyou Wildlands Center, and I'd like to reserve 5 of that 15 minutes for my rebuttal. In the Cascade Mountains of Southern Oregon, the Bureau of Land Management manages forests in the South Fork Little Butte Creek Watershed. In 1998, the BLM began planning a major timber sale in this watershed, and they called it then the Little Butte Creek VA Timber Sale Project. In 1999, they came out with the South Fork Little Butte Creek Project Timber Sale Civil Cultural Management Prescription, and this described four different timber sales that were going to be part of this project. The project overall is very large across the magnitude of the watershed. It would log 35 million board feet, which is roughly equivalent to 7,000 log trucks across 10,000 acres, construct 4.5 miles of new road, renovate and reconstruct 100 miles of new road. The BLM decided to go forward with this project without the benefit of an environmental impact statement to analyze the project in its entirety. Rather, it broke the project up into four different pieces, the timber sales that I mentioned before, and analyzed each in individual EAs, then concluded that no EIS was necessary. At the district court below, the plaintiffs brought two main claims. First, that NEPA requires the BLM to look at this timber sale in its entirety, and failing to do so is a violation of NEPA. Second, that the cumulative impacts analyses in each individual EA did not provide a comprehensive look at the impacts of the entire project, especially in conjunction with private lands, which are about half of the watershed, and about 42% of that is private industrial timberland and has been heavily logged. The BLM's defense relies almost primarily on an idea of tiering. Tiering is defined as NEPA as a process to avoid unnecessary repetition of similar or identical analysis in consequent environmental impact statements or EAs. However, the BLM misuses this in three different ways. Initially, the BLM says that because the resource management plan for the Medford district has an environmental impact statement, that they need not look at the entire project in its entirety because this environmental impact statement for the entire area already exists. Second, they say that even if there is defect in the environmental assessment, that they can just tier to the analysis that's in the RMP EIS, and this somehow makes up for any defect in the site-specific analysis. Third, and most disturbing, is that the BLM relies on the existence of the RMP EIS to change the way they determine whether or not there is significance at the project level. They say that because the EIS already exists for the entire district, and not only is it for actions in the district, but it's for the management plan of the district, which is a quite different document, which I'll get into later. They say because this exists, they no longer have to make NEPA's required site-specific determination of impact. They only have to determine whether or not the action is, quote-unquote, more significant than already anticipated in the EIS for the RMP. So functionally, what they're saying in this case is, yes, the actions on the ground may be significant, but we don't have to do a site-specific EIS for that. We can simply tier to this broad-based analysis in the RMP EIS, and that should make up for any deficiency that we have in the environmental assessment. Now, the main problem with this argument that the BLM brings up to counter is that the RMP EIS is a fundamentally different type of document than the site-specific EIS would be. If you look at the supplemental excerpts of record at 65 to 68, it discusses what type of analysis the RMP EIS does, and it's very telling that the RMP EIS looks at these broad-based 10-year management scenarios based on models of which they cannot, say, actually have any actual findings because the models are too new to be scientifically affirmed. And they say, confidence in the model's numbers varies, but in all cases, these models are more useful for comparison of the relative consequences of alternatives than precise predictions of future impact. Very obviously, the RMP EIS does not actually discuss the future impacts of any projects. Well, if you're right about the RMP EIS or the EIO or whatever, what do you get if you win? What happens? What happens if we're right about the RMP – well, first, I'd like to tell you what happens if we're wrong about the RMP EIS, or if you find we are, because that's the scariest scenario. What I'm trying to say is what relief we fashion is what I'm getting at. Oh, okay. Well, if plaintiffs are correct in this, what would happen is very similar to what this court did in Blue Mountains Biodiversity Project v. Blackwood, which was very similar. There were five timber sales, all in one watershed that the Forest Service in that case planned, and they did separate EAs for all. The Ninth Circuit looked at that and said, you can't do this because you're not looking at the project in its entirety. And it sent them back to prepare a single comprehensive EIS that looked at all of the projects together in one document. Does it have to be an EIS, or can it be an environmental assessment in one? It could be an environmental assessment, but I'd like to submit a project of this magnitude with 35 million board feet over 10,000 acres most definitely will have a significant impact on the environment. This court has referred back EISs for projects as small as 3 million board feet in different watersheds. Don't they get the first crack at it? They do, yes. Typically, the BLM will either do an EA to determine whether an EIS is necessary, or just determine that an EIS is necessary based on the magnitude of the project, and start with an EIS rather than going through the two steps. But whether or not it's an EA or an EIS isn't necessary. What's necessary is that they actually look at the impacts of the project in one document, so they can make a supportable determination of whether or not it's significant. So what you're really asking for, when everything else is put aside, is you want it remanded with directions to do whatever they're going to do in one document. Exactly. It doesn't necessarily have to be an environmental impact statement. Exactly, because NEPA regulations are very clear that proposals or parts of proposals that are similar enough to be in effect a single course of action need to be analyzed in a single document, that cumulative actions or similar actions also should be analyzed in a single NEPA document, especially if that's the best way to assess the overall impacts of the project in its entirety. Can they tier to anything if it goes back? Can they tier to anything in their single document? Well, they can tier to the general discussion in the RMP EIS. We're not opposed to the actual practice of tiering, just the practice of tiering to avoid discussion. The tiering to the RMP EIS would be appropriate if they were tiering to, you know, the discussion in the RMP EIS of the overall broad-based generalized impacts of the Medford Resource Management Plan as a whole. That is completely appropriate use of tiering, but they're trying to use tiering to avoid having actual substantive site-specific data in the EAs. Were the environmental assessments that were done, were they adequate standing on their own but not comprehensive because it wasn't, didn't consider all the projects together? What's the problem with those in particular? Actually, the EAs standing alone are inadequate, and we go into that extensively in the briefing. And that's mostly for one. They have to start from scratch, in other words. Well, yeah, one main reason the EAs are inadequate is because they do not include any substantive data. This court has clearly said that in order for the agency to make a supportable determination of impact, it needs to present the data upon which the agency makes its determination. Instead of that, we have things like a BLM admission that in the ID team notes, which is a supplemental excerpt of record 215 to 216, we don't actually have any hard data on a lot of topics. We have this fuzzy logic that we can use to support our predictions and outcome. And that's what the BLM is putting forward. They recognize they didn't have the data. They went forward regardless without collecting the data and just had EAs that are full of generalized statements of possible effect. And again, in Blue Mountain's biodiversity project, the Ninth Circuit said, general statements of possible effect or some impact do not constitute a hard look, absent some justification why more information couldn't be included. So neither the public nor the agency actually had the benefit of any hard data in the EAs. So they would have to go back and start from scratch. But in doing so, they would be collecting the data that NEPA required them to do in the first place. And as the South Fork Little Butte Creek is already a very heavily impacted area. It's water quality listed for sediment. It's critical habitat for owls and salmon. And it's very, very heavily impacted from past management practices. That data is necessary before they can make any kind of supportable determination of impact. And if they just defer doing that to this broad-based RMPES that has no substantive data nor any analysis of future impact, then we're going to have a situation where a major federal action will be moving forward without any information for the public or the agency anywhere that discusses the actual input of environmental effect to the watershed. Is the effect on the watershed greater than the sum of the parts of the individual parcels as defined in these EAs so far? That we don't even know because it's very unclear as to what the sum of the parts are because none of the EAs actually quantify. Take sediment, for example, because that's something that you could have an actual quantifiable impact based on computer modeling. Another thing that Blue Mountains Biodiversity Project analyzed. Nowhere in the Conde Shell or the Indian study EA do they say how much is going into the watershed, which is already heavily impacted. Because we don't have any numbers, we don't even know what to add together to know what the sum of the parts would be. But usually in cumulative effects analysis, the sum of the whole is greater than just each part. Thank you, counsel. We'll stay here as long as we can. Good morning, Your Honors. My name is Tamara Roundtree, and I represent the BLM in this matter. With me at counsel table is Roger Nesbitt, who is counsel with the Regional Solicitor's Office. The most straightforward and revealing way in which to review the claims in this case is to look at exactly what it is that NEPA requires and exactly what it is that BLM did. Regarding the first issue of cumulative impacts, NEPA has indicated that when there is a proposed action, the agency is to look at not only the impacts of the proposed action, but those of the past, present, and reasonably foreseeable future actions. In this case, that's been done. If we look at first, well, actually, there are two threshold issues that this Court should address in undertaking its analysis of the case. The first is the timeframe during which the challenged EAs were prepared. What that reveals is what actions were on the horizon for the agency to consider. The second question is what information was available to the agency at that time regarding the foreseeable actions. What that reveals to the Court is what should be considered in the NEPA documents that are prepared. As for the Indian soda that was planned approximately, the EA was generated between 1999 and 2000, issued in the year 2000. At that time, there were several projects that were on the horizon that might have been conducted. And in the EA, it specifically identifies each of those potential actions. And of importance in this case, it identifies the three other actions that are of concern to the Center, that being the Condeshell, the Deer Lake, and the Hep C projects. Similarly, we turn to the Condeshell project. Does it go on to identify what the cumulative impact will be if those projects go forward? It has a cumulative impacts section, which identifies all of the resources of concern to the Center. Where would I find that? The cumulative impacts are, I have, I think, just for you examples of where they're addressed. At pages 197, 204, 257, 259, through 261. Isn't there supposed to be some place that analyzes everything together? Well, there is. That's what I've searched for, and to be honest, I haven't found it. Your Honor, there is a cumulative impacts section in each of the EAs for both the Indian Soda and the Condeshell, and the information is set forth there. And you have to read the entire section and the EA as a whole. I think I understand your concern, Judge Clifton. It might be that perhaps the format in which this is presented isn't such that one can just turn to a page and perhaps see soils and see everything that, for example, the Center thinks might need to be there. Perhaps that's a format that would be better for the court to assess, but what the specialists have done here for BLM is they've taken all of the information that they have available to them concerning the given sales and those that are foreseeable, and they've laid them out in a fashion as they have. If, for example, if you turn to the charts that are available, and the Center takes issue with the way in which the BLM has set forth its information, but these charts, though they are charts or though they are tables, provide the sort of information that it seems the Center is saying BLM is supposed to provide. There's nothing that simply says there may be some effects on some resources in the area. Indeed, it lays out the specific resources, and though done in chart form, which is consistent with NEBA's definition of an EA to be a concise document, it says, for example, there may be increases in sediment, for example, over the short term because of road improvements, but over the long term, the specialists have determined that there will be a decrease in sediment loads. Is there any data attached to that, any numerical expression, anything more than a general statement about what may happen? If I may first explain, when BLM has hard data available, whether it be quantitative data as to what's going to be affected in a sale or not, it's identified in the EAs. For example, for the Indian soda, there is actual data that's available concerning both the Indian soda proposed sale and for, for example, another sale, the Biber-Watson, and in the EA, for the Indian soda, it sets forth the actual quantitative data. It indicates, for example, the total foreseeable amount of acres that will be treated under the sale. It sets forth, for example, the miles of roads that may be closed or decommissioned. It does that for the proposed sale, and where it has actual data available, it sets forth that information regarding the other sales. Here, for example, though, when the Indian soda EA was prepared, the only other sale for which the agency had hard data of actually what was going to occur on the ground, it had it for Biber-Watson, which it included that information for. As for the Condeshell, for example, when the Indian soda EA was prepared, that hard information had not yet been developed. What BLM did, though, was whether, not to just ignore it, it actually, though, estimated data to provide for and facilitate a proper cumulative impact. So where would I find that? I'm just telling you, I've looked, and I can't find something that seems to me to be an expression of a cumulative impact. And if I can't find it, that gives me some concern. So when I ask a simple question, I mean a simple question. If I turn the Court's attention to, for example, pages 204, 259, and 260 of the Supplemental Excerpts of Record, it indicates there the exact number of acres to be treated under the sales for which that hard data is known, for the sales that it's known. And then it projects those numbers or provides estimates for the other foreseeable actions. What I --- Well, that's acres to be treated. Okay. The size of the parcel. But what does that tell me in terms of the impact on the watershed? Well, it's important to look on that page or on those pages also. It includes, for example, where the information is known. It says, for example, the number of miles of roads that will be closed, the miles that will be decommissioned. What this ultimately means, and to your honor, it may simply look like, well, so what? That's just the total number of acres that are going to be treated. For the specialists, what that means is, for example, where they have hard data, if there's going to be, for example, some thinning of trees, they are able to take the total acreage of treatment and then determine if those activities are conducted in that size area, what will be the impact. And in Blue Mountains, if I'm not mistaken, that's where the court found there was deficiency. There wasn't, for example, the identification of hard numbers like the amount of area that would be, the amount of acres, total acreage to be treated. Here we have total acreage. We have total miles. We have the information that the agency used and ultimately reached in its determination. As for the question of quantitative data, quote, unquote, which the center relies on quite a bit, I would like to draw this court's attention to its decision in Churchill County, which the court has recently decided in 2001, where the plaintiffs challenged the Department of the Interior's cumulative impacts analysis, alleging that it was deficient because it could have or should have. Actually, the plaintiff's allegation was as it is here, which is the agency was required to provide more quantitative data and more information. Now, this court, that panel, in responding took note of the fact that indeed it could fly spec, conduct a fly spec review of the cumulative impacts analysis. And the court also noted that perhaps if it were making the decision of the amount of detail that were to be provided, it might require more detail. It also noted that more quantitative data would be beneficial to the plaintiffs and would be beneficial to the agency. But ultimately, the court rejected all of those approaches, finding that the role of the court was to determine the legal sufficiency of the NEPA document. As here, in that mode, what the court has to look to determine is whether the agency considered all of the past, present, and reasonable foreseeable actions in the given area. It needs to make sure that for each of those, the resources of concern were addressed. If the court can look at the analysis done, and albeit in summary form, and that's what the EA represents, summary form of the analyses that were done and the conclusions that were reached. If the analyses and conclusions establish that there isn't going to be a significant impact, and that's the decision that the decision maker ultimately made, then the legal sufficiency of the document is established. Would you take a minute or two to comment on the question of whether these are similar actions, which therefore require a single report? For the particular question of similar, or do you mean kind of the whole analysis of connected, cumulative, or similar? Well, yes, certainly you can do the entire analysis, but I think clearest is similar. Particularly? But no, no, just address the subject generally however you would like, but I just want to make certain we cover that issue as well. Sure. As I presented the case Earth Island Institute to this Court in a 28-J letter for supplemental authority where the Court has recently undertaken this analysis. For connected, well, I'll begin with similar. The Court has found that, first of all, even if actions are deemed to be similar, that it is a question of the agency's discretion as to whether a single NEPA document is required. This Court has just found in that case that an agency may decide that it may prepare. It is not absolutely required to prepare a single document if it finds that the best way to assess the actions in a combined fashion is with one document. The question that this Court has to ask itself, and perhaps more importantly should ask the Center, is what would one NEPA document provide that the two EAs have not already provided? I'm not certain that any other different type of analysis would take place. Each of the actions that's of concern have been addressed, as have each of the resources. I have not yet determined what a single document would provide in terms of, for example, Judge Sotomayor's question, what's the relief? What is this other document going to look like? That's true. I mean, you could make that argument with a connected action also. You could say, well, why not do it in two documents? But the regulation says you do it in a single document. No. As this Court has just read in our filing, just read the regulations, there isn't an absolute requirement for the single document. Even for connected actions? Even if the Court looks at that provision, there's the use of the word should for connected actions, use of the word should for cumulative actions, and use of the word may for similar actions. So I would argue it's the government's position that it's not an absolute requirement. But, for example, with connected actions, this Court has just found that the test is for independent utility. Clearly here, these actions are independent. They may occur in the absence or together with one another, so they're not connected. But quite simply, so as not to eat up too much of my time, I think Earth Island is quite instructive as to how this Court is to proceed on the issue of a single document. If I could just address for a moment the – Earth Island dealt with preexisting boundaries between two different national forests. Is there any preexisting boundaries of that nature here? Preexisting boundaries in a physical – well – Well, one of the points specifically made, and I obviously dissented in Earth Island, although not on this particular point, that it made that – the reason the treatment of the two separate analyses was not considered a violation was that they had two separate forests to begin with. It happened that they were remedying a fire that crossed the boundary because they were divided by a river. But we concluded that it was not unreasonable for the agency to analyze for the two separate forests separately because they were being managed separately. And yet noted that one of the things they had to do, and the reports did in fact do that, was analyze the cumulative effect with regard to the owl habitat that crossed the boundary. Well, here it seems like we have a single project. Indeed, we're trying to tear back to an overall analysis, but you've got a larger region which is being chopped up into smaller parts and more detailed analysis is being offered for first of those because the first ones are going up for the timber sales first, without regard to a detailed or a quantitative analysis with regard to the impact of all of the projects that are foreseen. Your Honor, first of all, as to boundaries, for example, if in Earth Island there were boundaries of the two forests, here there are no boundaries as such and the BLM doesn't view any such boundaries as existing. It has approached these sales in its... Which suggests to me that Earth Island doesn't provide you with the comfort you think it does. Well, I don't know that the court necessarily separated the cumulative impacts analysis in terms of solely the boundary. For example, the court took note of the specific fact in its analysis of whether the actions in Earth Island were cumulative. The court said one of the factors that it looked at to determine if the agency was arbitrary and capricious in making the decision to prepare one document or two, it looked to see if the agency was intending to isolate its review of the actions for the purpose of minimizing cumulative effects and clearly that's not been done here. First of all, to correct you, there is not a single project here. The project before your honors is a challenge to the EA for the Indian soil and a challenge to the EA for the condo shell. The fact that at a point in the past BLM initially determined that it would look at an entire landscape project which coincided with a watershed does not mean that you now have a single project for which there is no final agency action. But part of the explanation we're being given is an attempt to tear back to an overall watershed analysis. What the agency teared back to is to an RMP EIS and if I just might make that point because I think the center greatly misunderstands our position. We are not saying that the RMP as the center says is a way of making up for deficiencies in the EA. The RMP is to clarify or actually to say what the RMP EIS is not. It is not a substitute for a project specific action and it's not being used in that way here. An RMP EIS does not obviate the need for an EIS for a site specific action if it's determined that there will be significant impacts that are either beyond the scope or other than what's been already identified in the RMP. What an RMP is, it's a programmatic or regional analysis, a document. The RMPs provide land and resource management plans for particular programs. Here, the RMP set forth allocations of land for categories of activities that may occur in those areas. For example, whether they be timber harvest or road construction or maintenance of species habitat and similar sorts of activities. Therefore, the EIS for that kind of document provides a hard look at potential environmental impacts of the effects on the land of such land allocations or such categories of activities. Therefore, you see the vital role that the RMP EIS plays for subsequent site specific actions. It functions as a baseline sort of document, a springboard document that informs subsequent site specific actions and the NEPA analyses conducted for those site specific actions. In this case, BLM properly relied on the relevant information in the RMP EIS. Actually, I believe the Senator would probably argue that it would have been remiss had it not relied on the general information that was provided in that document. Thank you, Jess. I'd like to start with Earth Island Institute. As you noted, Judge Clifton, it is not as distinguishable, or it is much more distinguishable than counsel initially alluded to. She was saying, first of all, in terms of cumulative actions and connected actions should be considered in EIS and that similar actions may be considered in EIS. If she went further into the regulation, it says that they may be considered in EIS, but, quote, the agency should do so when the best way to adequately assess the combined impacts of similar actions or reasonable alternatives to the actions is to treat them in a single impact statement. And this court in that case said that it wasn't primarily because of the prior administrative boundaries, the different patterns of ownership and destruction, different disparate timetables and separate supervisory personnel. Those were all of the reasons that the court gave why it wasn't the best way to analyze them in one impact statement. However, in this case, none of those administrative barriers exist, and, indeed, this was a single project in one watershed, and if you look at the projects, they are all overlapping in boundary and in impact. They are in the same Medford District resource area, in the Ashland District, planned by the same people who would have been more than capable of analyzing them in a single document. Ms. Rowntree challenges you to tell us what would be different in one document that is not already in two different documents. I think one of the main things, and this was addressed by the Supreme Court in Kleppe v. The Sierra Club, is that only through a comprehensive consideration of pending proposals can an agency evaluate different courses of action. Practically speaking, analyzing the entire South Fork Little Butte project in a single document allows the agency to review the project in its entirety, looking at the direct impacts of the whole project rather than tangentially referring to the cumulative impacts, which it doesn't do very well, in the EAs, and it also allows them to make alternatives to the project before going forward with any of the component parts. I'm a little lost. This is not my area of expertise, to put it mildly. Suppose they took the two EAs and stapled them together. Would that satisfy you? Not necessarily. A main reason is because of that, looking for having the opportunity to decide alternatives, because NEPA requires that before an agency goes ahead with any action, it decide reasonable alternatives to the action. Well, if you take one action and break it up into four different parts, and each EA provides alternatives to the part, but not the whole action, by the time you get a comprehensive view of the whole action, the action is completed, and you weren't able to chart any different courses beforehand. Not only that, but NEPA also requires for the agency to pull the information together into one accessible document. What they're asking us to do is look at from EA to EA to EA, which have no internal consistency. Like, if you look at the cumulative impacts analyses in Indian Soda versus the ones in Condeshell, they've done a completely different format with no cross-referencing. If they go back to the office and do a word processing, merge two files together, it comes out on one document. Are you satisfied? Well, we'll have one document. We'll still have to go through the alternatives analysis. It would be much better than what we have currently, which is two documents which have very little analysis. And I'd like to hit on the cumulative impacts analysis, if I may, because I think that you're very much on the right track with the fact that these EAs contain no hard quantifiable data. And the Ninth Circuit has said again and again in Blue Mountains, in Neighbors of Cutting Mountain, in Idaho Sporting Congress, that in order to have an adequate cumulative effects analysis, the agency must do more than just list the projects, must have, as Muckleshoot said, a catalog of relevant past or future projects. The analysis must also include a useful analysis of cumulative impacts. And the court has also said that to consider cumulative effects, some quantified or detailed information is required. Without such information, neither the courts nor the public, in reviewing the agency's decision, can be sure that the agency took a hard look. And in terms of what makes a hard look, Blue Mountains says that statements of possible risk or some effect do not make a hard look. If you look at the cumulative impacts tables that Ms. Rountree referred to in Indian Soda, the table that she extensively stressed, it's on some Supplemental Actors of Record, page 201, is a chart. And we don't take issue with the fact that it's a chart. We take issue with the fact that, first of all, it does not analyze the entire South Fork Little Butte project. And second, the chart only lists U's for unchanged, I's for improved, or D's for degraded for each thing, with absolutely no underlying analysis or data upon which the agency got these I's, U's, and D's. And some of the I's, U's, and D's actually contradict information that's elsewhere in the record, such as in soils. It says that soils will be unchanged even though elsewhere in the record they admit that they'll have 12% compaction through the area. So if you look at this, you know, maybe the agency specialists that she referred to might be able to look at this chart and make some sense of it. But NEPA is a document for the public and for the decision maker. And if it doesn't inform the public of the impact and doesn't allow the public access to the underlying data upon which the agency made its decision, then it doesn't do anything in terms of informing the public and allowing them to participate. So what we have is two EAs talking about projects that are right next to each other that were initially anticipated to be part of one holistic project with disparate cumulative impacts. And I encourage the court to find and favor the plaintiffs. Thank you very much. Thank you. Thank you both. That was a very helpful argument. And the case to be adjourned will be submitted. All rise. Can I just ask the Court of Appeals for the next circuit? This is adjourned. Thank you. Thank you. Thank you. Thank you. Thank you. You can lock it. Are you done with the case? Yeah. Okay. We're just going to give you a call to find out. No, we're done. We can lock it up. Okay. No problem. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Reinhardt, Silverman, Clifton